[Cite as *State v. Wilson*, 2020-Ohio-2962.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**CLARK COUNTY**

STATE OF OHIO

     Plaintiff-Appellee

v.

STEVE P.B. WILSON JR.

     Defendant-Appellant

:
:
:
:
:
:
:
:
:
:
:

Appellate Case No. 2018-CA-2

Trial Court Case No. 2017-CR-227

(Criminal Appeal from
 Common Pleas Court)

. . . . . . . . . . .

O P I N I O N

Rendered on the 15th day of May, 2020.

. . . . . . . . . .

JOHN M. LINTZ, Atty. Reg. No. 0097715, Clark County Prosecutor's Office, Appellate
Division, 50 East Columbia Street, Suite 449, Springfield, Ohio 45502
     Attorney for Plaintiff-Appellee

BRIAN BRENNAMAN, Atty. Reg. No. 0088988, 1616 Turner Road, Xenia, Ohio 45385
     Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} Steve P.B. Wilson Jr.[1] was convicted after a jury trial in the Clark County Court of Common Pleas of felonious assault, abduction, and domestic violence. The jury further found that the victim was pregnant at the time of the domestic violence (which was relevant to a specification to the domestic violence count), and the court found Wilson guilty of a repeat violent offender specification associated with the felonious assault count. Wilson received consecutive sentences totaling 20 years in prison. Wilson appeals, raising six assignments of error. For the following reasons, the trial court's judgment will be affirmed in part, reversed in part, and remanded for resentencing on the merged domestic violence and felonious assault charges.

## I. Factual and Procedural History

{¶ 2} According to the State's evidence at trial, in late January 2017, C.H. was pregnant with Wilson's child and was due to deliver in February. On Friday, January 27, Wilson came to C.H.'s residence drunk, pushed her, and accused her of having sex with someone else. C.H. denied his accusation, and Wilson briefly let the matter drop. Later, when a couple of Wilson's friends were there, Wilson accused her again. After his friends left, Wilson began hitting and punching C.H. Wilson grabbed C.H. by her hair and, while she was on her knees, repeatedly kneed her in the face. Wilson also kicked C.H. in the head.

{¶ 3} The abuse continued during the weekend. Wilson threatened C.H. and her family, causing C.H. to be afraid. Wilson told C.H. that, if C.H. were to leave, he would

---

[1] Wilson identified himself to the trial court as Steve Phillip Wilson Jr. The record, however, identifies Wilson in a variety of ways, including "Steve Phillip Bernard Wilson," "Steven P.B. Wilson Jr.," "Steve P.B. Wilson, Jr.," "Steve P.B. Wilson," and "Steve Wilson." Of particular relevance, the trial court's judgment entry captioned the case with "Steve P.B. Wilson Jr."

find her and would go after her family until she came out of hiding.

{¶ 4} At one point, Wilson told C.H. that she could fight back and lose her life, or she could have grease poured onto her. C.H. said she would do the grease. C.H. screamed as the grease was poured on her back, and Wilson threatened to cut her throat if she did not stop; C.H. stated that she instantly became silent. C.H. told the police that Wilson also hit her with a green metal fence post.

{¶ 5} C.H. did not immediately go to the hospital. On February 8, C.H. went into labor and went to Springfield Regional Hospital; C.H. reported that Wilson believed her injuries were then healed enough that she could go to the hospital and provide an explanation for her physical condition. Wilson threatened C.H. not to mention his name.

{¶ 6} C.H. initially reported that her injuries were caused by an automobile accident. However, she later told her doctor, a staff member with Children Services, and police officers that she had been assaulted by Wilson, the father of her child. C.H. testified before a grand jury on February 21. At the time of the grand jury hearing, C.H. stated that she still had a broken nose and a broken toe from the incident.

{¶ 7} Wilson was originally indicted on February 22, 2017 in Clark C.P. No. 2017-CR-102 for felonious assault (a felony of the second degree), abduction (a felony of the third degree), and domestic violence (a felony of the fifth degree). On April 24, 2017, Wilson was re-indicted under this case number (Clark C.P. No. 2017-CR-227) on the same offenses; the new indictment added a repeat violent offender specification to the felonious assault count. Wilson was served with the indictment at the Clark County Jail. The State dismissed the prior indictment in May 2017.

{¶ 8} On May 5, the State provided defense counsel with the recordings of

numerous jail phone calls involving Wilson. On May 8, the State filed a motion in limine, seeking to offer hearsay statements by C.H., whom the State believed would not cooperate and appear for trial due to Wilson's influence. On the same date, defense counsel requested a continuance of the May 9 trial date so that she would have more time to consider the new evidence. The court granted a continuance of the trial until August 1 and scheduled a hearing on the motion in limine; the hearing was continued at defense counsel's request.

{¶ 9} On August 1, 2017, the State again filed a motion in limine, pursuant to Evid.R. 804(B)(6); the motion indicated that the State had provided to defense counsel additional recordings of jail phone calls for the periods between May 5 to June 16 and June 15 to July 28. By agreement of the parties, the August 1 trial date was converted to a hearing on the motion in limine. The hearing was continued to allow Wilson to hear the recordings of the jail phone calls, and the hearing was held on August 3.

{¶ 10} The State argued that C.H. had several telephone communications with Wilson in which Wilson had encouraged C.H. not to appear for court, not to testify, and to request dismissal of the charges. The State indicated that C.H. had left the women's shelter where she was staying, had written a letter asking for the charges to be dropped, and was avoiding service of a subpoena. After detailing multiple jail telephone conversations between Wilson and C.H., the State argued that C.H.'s hearsay statements were admissible under Evid.R. 804(B)(6), which allows hearsay testimony if the declarant is unavailable due to a party's wrongdoing for the purpose of preventing the declarant from attending or testifying.

{¶ 11} Wilson opposed the motion in limine, arguing that C.H. had been

subpoenaed on August 1,[2] and the State could not establish that she was unavailable. On August 24, the trial court granted the motion in limine "in the event of the victim's failure to appear as a witness." Trial was scheduled for October 11, 2017.

{¶ 12} On October 2, 2017, the State filed a motion for a continuance due to the unavailability of one medical witness who treated C.H.; the doctor had informed the prosecutor that his mother had died and that he would be in Florida on the dates he was scheduled to testify. Wilson opposed the motion, arguing that the trial was scheduled to last a week, and there was no indication that the doctor could not be available on another date during the trial; Wilson also requested an own recognizance or significantly reduced bond if the matter were continued. The trial court granted the motion for a continuance and denied the request for a change in bond.

{¶ 13} On October 25, 2017, the State moved to call the victim, C.H., as a court's witness. The State indicated that it anticipated C.H. would recant her allegations at trial and testify that Wilson was not guilty of the charges; the State stated that it believed the recantation to be false. The court did not resolve this motion prior to trial.

{¶ 14} The matter proceeded to a jury trial on November 1, 2017. Prior to trial, the parties represented to the trial court that they had reached a plea agreement. During the *Alford* plea hearing, Wilson indicated that he did not want to enter his plea and, instead, wanted to have a trial. After further discussions with the court, Wilson also indicated that he wanted to represent himself at trial. The court had an extensive discussion with Wilson about his rights and obligations if he were to represent himself; Wilson continued to assert his desire to represent himself, and he signed a written waiver

---

[2] The return of service on subpoena indicates that C.H. was served on August 2, 2017.

of his right to an attorney.

{¶ 15} The State presented the testimony of a hospital physician, two police officers, and a Children Services employee, and it offered several exhibits, including photographs of C.H.'s injuries and recordings of select jail telephone calls. C.H. initially did not appear for the trial, and her grand jury testimony and other out-of-court statements were admitted through the State's witnesses. Wilson called six witnesses on his behalf, including C.H. The jury convicted him of all charges, including that C.H. was pregnant at the time of the domestic violence. The trial court found Wilson guilty of a repeat violent offender specification associated with the felonious assault count.

{¶ 16} After a presentence investigation, the trial court sentenced Wilson to 8 years for felonious assault, 8 years on the repeat violent offender specification, 36 months for abduction, and 12 months for domestic violence, with all sentences to run consecutively. Wilson's aggregate sentence was 20 years in prison. Wilson appealed.

{¶ 17} Wilson's original appellate counsel filed a brief pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), indicating that he found no non-frivolous issues for appeal. Upon an initial review, we found that several non-frivolous issues existed. We rejected the *Anders* brief and appointed new counsel for Wilson. Wilson now raises six assignments of error, which we will address in an order that facilitates our analysis.

## II. Speedy Trial

{¶ 18} In his first assignment of error, Wilson claims that the trial court erred by not dismissing his case on speedy trial grounds.

{¶ 19} The right to a speedy trial is guaranteed by the Sixth Amendment to the

United States Constitution and Article I, Section 10 of the Ohio Constitution. In Ohio, R.C. 2945.71 requires the State to bring a felony defendant to trial within 270 days of arrest. R.C. 2945.71(C). Each day during which the accused is held in jail in lieu of bail on the pending charge is counted as three pursuant to the triple-count provision of R.C. 2945.71(E). This "triple-count" provision reduces to 90 days the time for bringing to trial an accused who is incarcerated the entire time preceding trial. *State v. Dankworth*, 172 Ohio App.3d 159, 2007-Ohio-2588, 873 N.E.2d 902, ¶ 31 (2d Dist.).

{¶ 20} Pursuant to R.C. 2945.71(H), the time within which an accused must be brought to trial is extended by "[t]he period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion."

{¶ 21} As an initial matter, the State asserts that Wilson failed to raise a speedy trial claim at or prior to trial and, consequently, his speedy trial claim is waived for appeal. R.C. 2945.73(B) states that, "[u]pon motion made at or prior to the commencement of trial, a person charged with an offense shall be discharged if he is not brought to trial within the time required by sections 2945.71 and 2945.72 of the Revised Code."

{¶ 22} A defendant's failure to raise a speedy trial violation in the trial court at or prior to trial precludes the defendant from raising that issue on appeal. *State v. Humphrey*, 2d Dist. Clark No. 02 CA 25, 2003-Ohio-2825, ¶ 17, citing *State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, 781 N.E.2d 72, and *State v. Thompson*, 97 Ohio App.3d 183, 186-187, 646 N.E.2d 499 (6th Dist.1994).

{¶ 23} The record reflects that Wilson did not file a written motion to dismiss on speedy trial grounds, and he did not expressly raise the issue at any of the pretrial

hearings or conferences that have been transcribed. Wilson did object to the State's October 2, 2017 motion for a continuance, which was based on a medical witness's unavailability due to a death in the family. He noted that he had been in jail since February 16 and that the State did not show that it could not call the witness (a doctor) on a different date during the anticipated week-long trial. Wilson asked that the continuance be denied or that he be released on an own-recognizance or reduced bond; he did not request dismissal.

{¶ 24} However, on the morning of the fourth day of trial (Monday, November 4, 2017), Wilson argued that his speedy trial rights were "completely shattered and violated." (Trial Tr. at 374.) He asserted that the case "should have been dismissed." (*Id.* at 377.) The trial court denied the oral motion, stating that the speedy trial issue "has already been ruled on." (*Id.* at 381.) The record thus indicates that Wilson raised an alleged violation of his speedy trial rights at or prior to the commencement of trial, which preserved his speedy trial argument for appeal.

{¶ 25} Wilson originally was indicted in Case No. 2017-CR-102, in which he was charged with felonious assault, abduction, and domestic violence, arising from the same incident involved in this case, Case No. 2017-CR-227. The State subsequently re-indicted Wilson on the same charges in Case No. 2017-CR-227, adding a repeat violent offender specification. The State dismissed Case No. 2017-CR-102 on May 9, 2017.

{¶ 26} " '[W]hen new and additional charges arise from the same facts as did the original charge and the state knew of such facts at the time of the initial indictment, the time within which trial is to begin on the additional charge is subject to the same statutory limitations period that is applied to the original charge.' " *State v. Adams* 43 Ohio St.3d

67, 68, 538 N.E.2d 1025 (1987), quoting *State v. Clay*, 9 Ohio App.3d 216, 218, 459 N.E.2d 609 (11th Dist.1983). Accordingly, we consider the records of both Case Nos. 2017-CR-102 and 2017-CR-227 in determining Wilson's speedy trial time.[3]

**{¶ 27}** The parties agree that Wilson was arrested on February 16, 2017, and was held continuously until his trial on November 1, 2017. Not counting the day of Wilson's arrest, Wilson was held in pretrial confinement for 257 days. *See, e.g., State v. Stewart*, 2d Dist. Montgomery No. 21462, 2006-Ohio-4164, ¶ 16 ("When computing speedy trial time, the day of arrest is not counted."). Without tolling, Wilson should have been brought to trial by May 17, 2017. Wilson's original trial date was May 9, 2017.

**{¶ 28}** The State argues that the first tolling event occurred on February 27, 2017, when Wilson's counsel served on the State Wilson's discovery demand and request for a bill of particulars. Defense counsel did not file this document with the court. The State indicates in its appellate brief that the demand is not filed pursuant to a policy of the Clark County Public Defender's Office, with the result that it avoids tolling events. The State attached a copy of the demand to its appellate brief as Exhibit A. The record reflects that the State responded to a written discovery request by Wilson on April 12, 2017, and filed a bill of particulars on April 13, 2017. The State's filings do not indicate when Wilson's discovery requests were served on the State.

**{¶ 29}** "A defendant's demand for discovery or a bill of particulars is a tolling event, pursuant to R.C. 2945.72(E)." *State v. Bakhshi*, 2d Dist. Montgomery No. 25585, 2014-Ohio-1268, ¶ 36; *State v. Brown*, 98 Ohio St.3d 121, 2002-Ohio-7040, 781 N.E.2d 159.

---

[3] We granted Wilson's motion to supplement the record with the record from Case No. 2017-CR-102.

Wilson's written discovery demand is not in the record, and we cannot consider new evidence (Exhibit A) attached to the State's appellate brief. *See, e.g., Williams v. Pioneer Credit Recovery, Inc.*, 2d Dist. Montgomery No. 28524, 2020-Ohio-397 ("[I]n reviewing the trial court's judgment, we are limited to the record before the trial court. * * * 'An exhibit merely appended to an appellate brief is not part of the record, and we may not consider it in determining the appeal.' ").

{¶ 30} Nevertheless, the State's request for reciprocal discovery, filed on April 13, indicated that its request was in response to Wilson's written discovery demand. The State was entitled to a reasonable period of time to respond to Wilson's discovery request. Regardless, in this case, we need not further determine how much time was tolled by Wilson's discovery demand and request for a bill of particulars, because even if the period between February 27 and April 12 were not tolled, Wilson's speedy trial time was not violated.[4]

{¶ 31} On the same day it filed its discovery response (April 13), the State filed a reciprocal demand for discovery. A defendant's failure to respond within a reasonable time to a reciprocal demand for discovery tolls the speedy trial period for a reasonable period of time. *State v. Palmer*, 112 Ohio St.3d 457, 2007-Ohio-374, 860 N.E.3d 1011, paragraph one of the syllabus; *State v. Deacey*, 2d Dist. Montgomery No. 27408, 2017-Ohio-8102, ¶ 86. Wilson filed a notice of alibi (which the State construes as Wilson's response to reciprocal discovery) on April 27, 2017, 14 days later. Wilson responded within a reasonable period of time. Accordingly, the speedy trial time was not tolled

---

[4] On this record, we need not address the intent and legal effect of the Clark County Public Defender's Office's purported policy that written demands for discovery not be filled with the trial court.

between April 13 and April 27.

{¶ 32} On May 8, 2017, Wilson moved for a continuance, stating that defense counsel required additional time to review evidence that was provided by the State on May 5. (The evidence consisted of recordings of jail phone calls by Wilson between April 19 and May 5.) On the same date (May 8), the State filed a motion in limine, seeking to use hearsay statements by C.H., pursuant to Evid.R. 804(B)(6). After a hearing, the trial court granted Wilson's motion for a continuance and rescheduled the trial for August 1, 2017.

{¶ 33} On appeal, Wilson argues that the length of the continuance (from May 8 to August 1) was unreasonable. Under the facts of this case, we disagree. During that time, the trial court needed to resolve the State's motion in limine, pursuant to Evid.R. 804(B)(6), which was based on the State's expectation that C.H., the victim, would not appear at trial due to wrongdoing by Wilson. The court scheduled a hearing on the motion in limine for June 26, 2017. However, this hearing was continued at the request of the defense due to an unexpected family emergency with defense counsel, and a hearing did not occur until August 1. The entire period between May 8 and August 1 was tolled for speedy trial purposes.

{¶ 34} On August 1, 2017, the scheduled trial date, the State filed another motion in limine, seeking to use hearsay statements by C.H., pursuant to Evid.R. 804(B)(6). At the request of the parties, the trial date was converted to a hearing on the pending motion in limine. However, the hearing reasonably was continued until the next day due to an issue with the CD of the jail calls.

{¶ 35} On August 2, the trial court filed a notice of the new trial date, which was

scheduled for October 11, 2017. The hearing on the motion in limine again was reasonably continued until the next day (August 3) to allow Wilson to hear the phone calls that the parties would be submitting to the trial court. The parties filed post-hearing memoranda on August 10, and the trial court tentatively granted the State's motion on August 24.

{¶ 36} Wilson agrees that the delay between August 1 and 10 was reasonable and, therefore, tolled, but disputes that the time was reasonably tolled by the August 1 continuance of the trial date until October 11. The period between August 1 and August 24 was a reasonable period for the trial court to resolve the pending motion in limine. The August 1 trial date was continued with the agreement of the parties, and the new trial date of October 11 was not an unreasonable delay from August 24, when the court ruled on the motion in limine.

{¶ 37} On October 2, the State sought a continuance due to the unavailability of a medical witness during the scheduled trial dates. On October 12, the court granted the motion, over Wilson's objection, and scheduled trial for November 1. The unavailability of a witness is a reasonable basis for a continuance under R.C. 2945.72(H). *State v. Jones*, 2d Dist. Clark No. 2013 CA 118, 2014-Ohio-4605, ¶ 14; *see, e.g., State v. Saffell*, 35 Ohio St.3d 90, 518 N.E.2d 934 (1988); *State v. Nesser*, 2d Dist. Clark No. 2013 CA 21, 2014-Ohio-1978, ¶ 35.

{¶ 38} In short, the State originally had until May 17 to bring Wilson to trial. Even assuming that no tolling occurred as a result of discovery, Wilson first sought a continuance of the trial on May 8. The subsequent continuances of the trial date arising from the pendency of the State's motions in limine were reasonable, and two of those

continuances were at the request or joint request of defense counsel. Moreover, the trial court reasonably continued the trial due to the unavailability of a State's witness. As a result, only the period until May 8 counted against Wilson's speedy trial time. Wilson's November 1 trial was timely.

{¶ 39} Wilson's first assignment of error is overruled.

### III. Waiver of Counsel and Role of Stand-by Counsel

{¶ 40} Wilson's fifth assignment of error concerns his constitutional rights to counsel and self-representation. First, he claims that the trial court should have offered substitute counsel rather than accepting his waiver of his right to counsel. Second, he claims that the trial court erred by improperly limiting the role of stand-by counsel.

*A. Waiver of Right to Counsel*

{¶ 41} A criminal defendant has the independent constitutional right of self-representation. *Faretta v. California*, 422 U.S. 806, 819, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *State v. Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, 816 N.E.2d 227, ¶ 23. Thus, a defendant may proceed to defend himself without the benefit of counsel when he or she voluntarily, knowingly, and intelligently elects to do so. *State v. Youngblood*, 2d Dist. Clark No. 05CA87, 2006-Ohio-3853, ¶ 10, citing *State v. Gibson*, 45 Ohio St.2d 366, 345 N.E.2d 399 (1976).

{¶ 42} However, "[c]ourts are to indulge every reasonable presumption against the waiver of a fundamental constitutional right, including the right to counsel." *State v. Dyer*, 117 Ohio App.3d 92, 95, 689 N.E.2d 1034 (2d Dist.1996); *State v. Street*, 2d Dist. Montgomery No. 26501, 2015-Ohio-2789, ¶ 35. The waiver must affirmatively appear in the record, and the State bears the burden of overcoming presumptions against a valid

waiver. *Dyer* at 95; *Street* at ¶ 35. Crim.R. 44(C) requires a waiver of counsel to be "in open court and the advice and waiver shall be recorded as provided in [Crim.R.] 22."

{¶ 43} "In order to establish an effective waiver of right to counsel, the trial court must make sufficient inquiry to determine whether defendant fully understands and intelligently relinquishes that right." *Gibson* at paragraph two of the syllabus. To be valid, a waiver of counsel "must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter." *Id.* at 377, quoting *Von Moltke v. Gillies*, 332 U.S. 708, 723, 68 S.Ct. 316, 92 L.Ed. 309 (1948). Additionally, the defendant "should be made aware of the dangers and disadvantages of self-representation." *State v. Perdue*, 2d Dist. Montgomery No. 23151, 2010-Ohio-565, ¶ 44, quoting *State v. Gatewood*, 2d Dist. Clark No. 2008 CA 64, 2009-Ohio-5610, ¶ 33.

{¶ 44} On the morning of trial (November 1, 2017), the court initially met with the parties regarding a plea agreement. During the plea colloquy, Wilson told the court that he was satisfied with the "advice and representation" he had received from his attorney. After the trial court explained to Wilson the elements of the charges and specifications to which he was pleading (felonious assault with a repeat violent offender specification and abduction), the court began to review Wilson's constitutional rights. The following exchange then occurred:

> THE COURT: All right. At the trial you would have the right to be confronted by every witness brought against you and the right to cross-examine those witnesses, do you understand these rights?

THE DEFENDANT: Can I do it?

THE COURT: Your attorney would be the one cross-examining the witnesses.

THE DEFENDANT: Can I question them myself?

THE COURT: You would have the right to represent yourself, but you could not do it at that trial because, well, I take that back. You would have to present sufficient argument to the Court that you want to exercise your constitutional right to represent yourself, and then you could proceed under that manner. You have that constitutional right. There's a whole different line of questions that you and I would go through to see if you are prepared to do that, do you understand that?

THE DEFENDANT: That sounds good.

THE COURT: Okay. So, again, you're telling the Court you do not want to take this plea deal, you want to go to trial and represent yourself?

THE DEFENDANT: Yes. Yes.

(Trial Tr. at p. 29-30.) The court informed Wilson that the trial would still proceed that afternoon if he represented himself; Wilson stated that he understood.

{¶ 45} The trial court then asked Wilson a lengthy series of questions regarding his desire to waive his right to counsel. Wilson initially expressed that this was a "presiding case" and that he received ineffective assistance of counsel. He stated that he had just told the court that he was satisfied with his attorney because he "was just going to take the deal and get it over with," but he actually was not satisfied at all. He felt his counsel had not been "working her hardest." When questioned by the court,

Wilson stated that he understood that he was being represented at no cost and that his attorney had extensive experience in handling criminal matters. The court told Wilson that, if he represented himself, the jury may wonder why he was representing himself and might have a negative feeling about that.

{¶ 46} The court also told Wilson that he would be held to the same rules of evidence. When asked if he understood the rules of evidence, Wilson replied, "All the State's evidence is admissible, and mine is not." The trial court told Wilson that was incorrect, and that the same rules apply to the State and the defense. The court asked Wilson if he had represented himself in court before and if he had any educational background in legal matters; Wilson did not. Wilson stated that he had been studying law since his incarceration and was familiar with the Rule of Criminal Procedure. Wilson said that he understood that he was bound by those rules. The court discussed with Wilson the witnesses he intended to call and whether witnesses could be summoned at that time.

{¶ 47} The court asked Wilson if he understood that the court would not function as his lawyer, give legal assistance, or advise him on how to try his case, that Wilson's lack of knowledge of the rules of procedure or evidence would not be a reason for the court to ignore those rules, and that Wilson would give up the right to later claim ineffective assistance of counsel. The court explained the charges against Wilson and the maximum sentences he faced.

{¶ 48} The court asked Wilson if he knew what defenses he might have and any evidence in mitigation; the court explained that an alibi defense was an affirmative defense. The court asked Wilson if he understood that any lack of knowledge regarding

the procedure for introducing his evidence would not be grounds for an appeal, that an attorney may be aware of ways of defending the charges that may not occur to him, that he must proceed by asking questions and could not simply argue with witnesses, and that he would need to take the stand and testify under oath to give his own testimony, subject to cross-examination by the prosecutor. Wilson expressed his understanding. The court told Wilson that he had the right to remain silent and not to incriminate himself. Wilson and the court discussed Wilson's ability to call witnesses. The court told Wilson that he would be required to conduct himself in a professional, respectful manner (in contrast to an outburst by Wilson earlier in the day). The court concluded:

I must advise you that in almost every case it would be my opinion that a trained lawyer would defend you far better than you could defend yourself. It is almost always unwise for a Defendant on trial to try to represent themselves. You are not familiar with the law, and you are not familiar with the handling of a trial. You are not familiar with court procedures. You are not familiar with the rules of evidence. You are, and I so would strongly urge you not to try to represent yourself, do you understand my position in this matter?

Wilson expressed his understanding of all of the issues raised by the court. Wilson elected to represent himself and signed a written waiver of his right to counsel.

{¶ 49} The record reflects that the trial court conducted a thorough inquiry to ensure that Wilson knowingly, intelligently, and voluntarily waived his right to counsel. We find no error in Wilson's assertion of his right to self-representation and the waiver of his right to counsel.

{¶ 50} The trial court was not required to offer Wilson the opportunity for new counsel, as opposed to self-representation. "In evaluating a request for substitute counsel, the court must balance the accused's right to counsel of his choice against the public's interest in the prompt and efficient administration of justice." *State v. Griffin*, 2d Dist. Montgomery No. 24001, 2012-Ohio-503, ¶ 13, citing *State v. Murphy*, 91 Ohio St.3d 516, 747 N.E.2d 765 (2001).

{¶ 51} The issue of Wilson's dissatisfaction with his attorney arose on the morning of the scheduled jury trial. The trial court could have reasonably concluded that a request for substitution of counsel at that juncture would be untimely, as a jury was already assembled and a continuance would result in a substantial delay of the trial. Moreover, at no point did Wilson request substitute counsel; his statements to and questions of the court reflected his desire to represent himself at trial. *See State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, 781 N.E.2d 72, ¶ 43 ("Since appellant never requested substitute counsel, the trial court did not abuse its discretion in failing to appoint new counsel. The transcript clearly indicates that appellant wanted to act pro se.").

*B. Role of Standby Counsel*

{¶ 52} During the discussion about the waiver of counsel, Wilson asked the trial court, "It is possible that I could have assistance, counsel?" The court responded:

No. She [defense counsel] cannot assist you. She can be on standby in case at some point in time you decide you're in over your head, and you don't want to be representing yourself anymore, but understand if that happens, the trial doesn't start over again. She comes back to the counsel table and takes up the trial where we stopped, but she does not assist you

while you're representing yourself, do you understand?

Wilson claims that the trial court's answer improperly limited the role of standby counsel in his case.

{¶ 53} In recognizing the right to self-representation, *Faretta* made a passing reference to standby counsel: "Of course, a State may -- even over objection by the accused -- appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary." *Faretta*, 422 U.S. at 834, 95 S.Ct. 2525, 45 L.Ed.2d 562, fn. 46, citing *United States v. Dougherty*, 473 F.2d 1113, 1124-1126 (D.C.Cir.1972).

{¶ 54} *McKaskle v. Wiggins*, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984), subsequently addressed the degree to which standby counsel could assist a defendant over the defendant's objection. The court noted that "[a] defendant's right to self-representation plainly encompasses certain specific rights to have his voice heard. The pro se defendant must be allowed to control the organization and content of his own defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial." *McKaskle* at 174. The supreme court declined to set a bright-line standard for standby counsel's participation in a defendant's representation, concluding instead that "the primary focus must be on whether the defendant had a fair chance to present his case in his own way." *Id*. at 177. However, the court provided two specific limitations: (1) "the pro se defendant is entitled to preserve actual control over the case he [or she] chooses to present to the jury," and (2) "participation by standby counsel without the defendant's

consent should not be allowed to destroy the jury's perception that the defendant is representing himself."   *Id.* at 178.

{¶ 55} The supreme court further recognized that

*Faretta* rights are also not infringed when standby counsel assists the pro se defendant in overcoming routine procedural or evidentiary obstacles to the completion of some specific task, such as introducing evidence or objecting to testimony, that the defendant has clearly shown he wishes to complete.   Nor are they infringed when counsel merely helps to ensure the defendant's compliance with basic rules of courtroom protocol and procedure.   In neither case is there any significant interference with the defendant's actual control over the presentation of his defense.

*Id.* at 183.

{¶ 56} In Ohio, "[o]nce the right to counsel is properly waived, trial courts are permitted to appoint standby counsel to assist the otherwise pro se defendant."   *Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, 816 N.E.2d 227, at ¶ 28.   However, a criminal defendant has no right to hybrid representation, where an attorney acts as co-counsel with the defendant.   *State v. Keenan*, 81 Ohio St.3d 133, 689 N.E.2d 929 (1998); *Martin* at ¶ 32.

{¶ 57} In support of his argument, Wilson cites to *State v. Hackett*, 7th Dist. Mahoning No. 17 MA 0106, 2019-Ohio-1091, *appeal accepted*, 156 Ohio St.3d 1470, 2019-Ohio-2953, 126 N.E.3d 1185.   In that case, the defendant filed a motion for "full assistance of counsel," which the trial court denied as a motion for hybrid counsel.   The defendant subsequently, at the beginning of trial, asked the trial court how it defined the

responsibilities of standby counsel.   The court responded, "If you decide now or during the trial that you are in over your head and ask me to have Attorney DeFabio step in, then he would come in as your attorney.   It is nothing more and nothing less than that."   On appeal, Hackett claimed, in part, that the trial court had improperly limited the role of standby counsel.

{¶ 58} The Seventh District overruled that assignment of error, reasoning that the record demonstrated that standby counsel's involvement was not as limited as the court had suggested it would be.   The appellate court pointed out that standby counsel talked with and "notified" the investigator that was appointed by the trial court for Hackett and that standby counsel was at sidebar discussions or conferences held outside the presence of the jury.   The Seventh District noted that the trial court's pretrial statements did not indicate that Hackett could not ask counsel procedural or evidentiary questions, and the trial court did not correct standby counsel when he indicated at one pretrial hearing that part of his job as standby counsel was to answer questions about how to get evidence into the record.   The Seventh District concluded:

> The trial court's statement immediately prior to trial, when considered in isolation, might be seen as an indication Appellant could not ask counsel how to introduce evidence at trial.   Case law from our sister districts indicated standby counsel is permitted to answer a defendant's questions regarding courtroom procedure.   *Hardman*, 2016-Ohio-498 and *Owens*, 2008-Ohio-4161 at ¶ 26.   The introduction of evidence could be considered courtroom procedure.   However, the statement cannot be considered in isolation; it must be considered in conjunction with all the other trial court

instructions on the role of standby counsel and in conjunction with Appellant's motion for full assistance of the standby counsel.

In this case, it appears Appellant wanted counsel to be able to ask questions when he could not correctly formulate them and wanted counsel to introduce evidence, which would essentially amount to standby counsel acting as co-counsel. In the motion requesting full assistance of standby counsel, Appellant states standby counsel should be permitted to "proactively engage issues." 3/31/17 Motion. "Standby counsel need not and should not sit mute in the back of the courtroom, unable to actively consult with Defendant, or when necessary, speak on record to advance Defendant's legal and procedural goals in ways he himself is unable to do for want of a lawyer's training." 3/31/17 Motion. Appellant does indicate in the motion that counsel sitting at the table with him would be to ensure compliance with basic rules of procedure. 3/31/17 Motion. However, the statements he makes in this motion are more akin to hybrid representation even though he states he knows that is not permitted.

From the record, we are unable to discern whether Appellant and standby counsel were permitted to have conversations during breaks. At no time did Appellant ask for a recess to consult with standby counsel. Furthermore, during the entire lengthy trial, Appellant did not have much trouble introducing evidence and questioning witnesses.

Considering the entire record, we conclude the trial court did not improperly limit the role of standby counsel. This assignment of error lacks

merit.

*Hackett* at ¶ 59-62.

**{¶ 59}** As in *Hackett*, the trial court initially told Wilson that standby counsel's role was limited to watching the trial and being available to resume representation if Wilson no longer wanted to represent himself. However, the court provided opportunities for Wilson and standby counsel to discuss various matters outside of the trial proceedings.

**{¶ 60}** At the conclusion of the testimony of Detective Fent, the State's first witness, Wilson asked the court "how will I play the calls that I want to play?" The court responded that Wilson could identify which ones he wanted and ask that they be played. At that juncture, the court ordered a recess. Later, before trial resumed, Wilson told the court that he never had a chance to pick out which calls he wanted to use and that he "need[ed] previous counsel because she has that information to let me know these tapes." Standby counsel told the court that they had not discussed which recordings Wilson would like to play, but she believed they were the same as for the motion in limine hearing. Standby counsel further stated that, if there were more, she could go over that with Wilson. The court told Wilson that he could discuss the matter with standby counsel and "make sure before tomorrow." (Trial Tr. at 253.)

**{¶ 61}** At the conclusion of the third day of trial (a Friday), after the State rested, the court revisited with Wilson the issue of the jail call recordings. The court told Wilson that it was going to recess the trial until Monday and that Wilson could "go over the information your attorney has regarding those discs. * * *" When Wilson indicated that he would like to subpoena witnesses for his case, the trial court again responded, "Ask your attorney, your prior attorney about how that's done, sir."

{¶ 62} When trial resumed on Monday, November 6, Wilson raised numerous legal issues. It is unclear whether Wilson discussed these issues with standby counsel over the weekend. During the afternoon, the court and Wilson again had a discussion about the witnesses Wilson wished to call, and the court told Wilson that he could try to reach them and obtain their appearance. When Wilson expressed concern about his access to a telephone, the court replied, "In which case perhaps you might ask your prior attorney if she could help you and assist you in that way."

{¶ 63} Standby counsel did not assist or provide guidance to Wilson while the jury was present. Wilson questioned the prospective jurors during voir dire, gave opening and closing statements, cross-examined the State's witnesses, and presented his own witnesses. The court thoroughly explained the rules of evidence to Wilson when it denied his requests to offer certain exhibits or present certain testimony. Wilson did not request assistance of standby counsel during the trial, except as otherwise noted above.

{¶ 64} As with *Hackett*, the record reflects that, despite the trial court's statement that standby counsel's role would be limited to observing the trial and being available to step in as counsel if needed, the court expressly permitted Wilson to consult with and obtain assistance from standby counsel regarding the recordings of jail phone calls that he might want to present at trial and securing the attendance of witnesses. The record demonstrates that Wilson was able to communicate with standby counsel during the weekend between the end of the State's case-in-chief and the beginning of Wilson's presentation of his case, as well as after court recessed following the fourth day of trial. On this record, the trial court did not improperly limit the role of Wilson's standby counsel.

{¶ 65} Wilson's fifth assignment of error is overruled.

## IV. Admission of Victim's Statements

{¶ 66} In his third assignment of error, Wilson claims that "the trial court abused its discretion when it permitted the admission of hearsay evidence pursuant to Evidence Rule 804(B) and the Confrontation Clause of the United States Constitution." Specifically, Wilson asserts that the trial court should not have allowed the State to present C.H.'s out-of-court statements through other witnesses.

{¶ 67} "[T]he [United States] Supreme Court has recognized that a defendant's Sixth Amendment right to confront witnesses against him is violated when an out-of-court statement that is testimonial in nature is admitted into evidence without the defendant having had the opportunity to cross-examine the declarant." *State v. Eicholtz*, 2d Dist. Clark No. 2012-CA-7, 2013-Ohio-302, ¶ 26, citing *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Testimonial statements include statements " 'that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " *State v. Kelley*, 2d Dist. Clark No. 2011 CA 37, 2012-Ohio-1095, ¶ 58, quoting *Crawford* at 52; *State v. Kerr*, 2d Dist. Montgomery No. 26686, 2016-Ohio-965, ¶ 22.

{¶ 68} In this case, the Confrontation Clause question is easily resolved. The admission of hearsay does not violate the Confrontation Clause if the declarant testifies at trial. *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 64, citing *California v. Green*, 399 U.S. 149, 155, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) and *State v. Keenan*, 81 Ohio St.3d 133, 142, 689 N.E.2d 929 (1998); *see also State v. Dewberry*, 2d Dist. Montgomery No. 27434, 2020-Ohio-691, ¶ 124. Although C.H. did not appear for the State, C.H. testified at trial on behalf of Wilson. Accordingly, his right

to confront her as a witness was not violated.

{¶ 69} The Ohio Rules of Evidence require an additional layer of analysis. Because testimony may be admissible under the Confrontation Clause yet inadmissible under the rules of evidence, and vice versa, *see Crawford* at 51, the declarant's statements must fall within the constitutional requirements and the rules of evidence to be admissible. *State v. Nevins*, 171 Ohio App.3d 97, 2007-Ohio-1511, 869 N.E.2d 719, ¶ 36 (2d Dist.).

{¶ 70} Evid.R. 804 permits the use of out-of-courts statements from an unavailable witness under certain circumstances. The Rule defines "unavailability as a witness" to include situations in which the declarant "is absent from the hearing and the proponent of the declarant's statement has been unable to procure the declarant's attendance * * * by process or other reasonable means." Evid.R. 804(A)(5).

{¶ 71} "Forfeiture by wrongdoing has long been recognized as an equitable exception to a defendant's constitutional right to confront the witnesses against him." *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 96, citing *Giles v. California*, 554 U.S. 353, 366, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008). Ohio codified this doctrine in 2001 as a hearsay exception under Evid.R. 804(B)(6), which provides:

(B) Hearsay Exceptions. The following are not excluded by the hearsay rule

if the declarant is unavailable as a witness:

* * *

(6) Forfeiture by Wrongdoing. A statement offered against a party if the

unavailability of the witness is due to the wrongdoing of the party for the

purpose of preventing the witness from attending or testifying. However, a

statement is not admissible under this rule unless the proponent has given to each adverse party advance written notice of an intention to introduce the statement sufficient to provide the adverse party a fair opportunity to contest the admissibility of the statement.

{¶ 72} "To admit statements under this exception, a prosecutor must show by a preponderance of the evidence: (1) the defendant engaged in wrongdoing which caused the witness to be unavailable, and (2) one purpose for the wrongdoing was to make the witness unavailable to testify." *McKelton* at ¶ 96, citing *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 106, and *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 84. The State need only show the defendant's wrongdoing which caused the witness's unavailability "was motivated in part by a desire to silence the witness." *Hand* at ¶ 84, ¶ 90; *State v. Price*, 5th Dist. Delaware No. 2019 CA 00019, 2020-Ohio-132, ¶ 12.

{¶ 73} First, Wilson asserts that C.H. did not qualify as an unavailable witness. Wilson argues that the State failed to subpoena C.H. for the November 1 trial and failed to introduce any evidence that law enforcement had attempted to serve an arrest warrant for C.H. Second, Wilson argues that, even if C.H. were unavailable, there was insufficient evidence that he caused her to be unavailable.

{¶ 74} The State prepared a subpoena for C.H. to appear at the May 9 trial. The Return of Service on Subpoena indicated that personal service was attempted three times, without success. C.H. apparently appeared voluntarily for Wilson's then-scheduled trial on August 2, and the State and defense counsel were able to serve her with a subpoena to attend the rescheduled trial on October 11, 2017. C.H. was not

released from her subpoena for October 11, 2017, and she did not appear on that date.

{¶ 75} On October 12, the State moved for an order for C.H. to show cause why she should not be held in contempt of court due to her failure to appear. The State also asked the court to issue a warrant for her arrest, as the State no longer had an address for C.H. (C.H. had been staying with Wilson's parents, but Wilson's father reportedly told the prosecutor on October 11 that C.H. was no longer staying with them.) The trial court granted the motion and issued a capias for C.H.'s arrest.

{¶ 76} The State issued two additional subpoenas for C.H. to appear on October 30, 2017, and November 1, 2017. C.H. was neither served with the subpoenas nor arrested prior to or on November 1, when the trial began. C.H. did not appear on November 1 or at any time prior to the State's resting its case-in-chief.

{¶ 77} At the hearing on the State's motions in limine, the State presented recordings of 18 phone calls by Wilson from the jail, which occurred between March 9, 2017 and May 9, 2017. (Motion Tr., Aug. 3, 2017, Joint Ex. 1.) Throughout the various conversations, Wilson repeatedly told C.H. that the State was trying to blackmail her, threaten her, and/or use her baby against her. Wilson encouraged C.H. to leave the women's shelter where she was staying, so that the State would not be able to locate her, and to stay with "his people." Wilson repeatedly stated that the State could not force its way into C.H.'s home or his parents' home to serve her with a subpoena, and that C.H. simply had to hide or avoid answering the door. Wilson once explicitly told C.H., "The only thing you have to do is not show up in court."

{¶ 78} At times, Wilson attempted to talk in code, telling C.H., for example, that he did not think that C.H. "should play basketball. Don't go to the basketball court. * * * I

don't want you to go to the basketball court."   In another conversation, Wilson told C.H. that the "groundhog" needed to "go underground for another three months."

{¶ 79} At one point, Wilson asked his parents to house C.H. for three months (after telling them that the State had 90 days to try him).   Wilson's father initially refused, saying that the police would look for C.H. there and that C.H. would need to go to Dayton instead. Wilson's father told Wilson to talk with his mother.   Wilson then told his mother that the State had 90 days to try him and C.H. needed to be "gone for three months."   Wilson assured Wilson's parents and C.H. that the police could not search the home and that C.H. could hide if they came.   Wilson asked his mother to pick up C.H.

{¶ 80} Based on the record, the trial court did not err in concluding that, at the time that the State was presenting its case-in-chief, C.H. was absent from the trial and that the State had been unable to procure her attendance by process or other reasonable means. In addition, the record supports the conclusion that Wilson engaged in wrongdoing through his repeated phone calls to C.H., which caused C.H. to be unavailable, and that one purpose for his wrongdoing was to make C.H. unavailable to testify on behalf of the State.   *Accord State v. Harper*, 2017-Ohio-1395, 89 N.E.3d 141, ¶ 21-32 (6th Dist.).

{¶ 81} Wilson's third assignment of error is overruled.

### V. Manifest Weight of the Evidence

{¶ 82} In his sixth assignment of error, Wilson claims that his convictions were against the manifest weight of the evidence.

{¶ 83} When reviewing an argument challenging the weight of the evidence, an appellate court may not substitute its view for that of the trier of fact, but reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of

witnesses, and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 84} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 85} In reviewing challenges based on the sufficiency and/or manifest weight of the evidence, we are required to consider all of the evidence admitted at trial, regardless of whether it was admitted erroneously. *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284; *State v. Rosales*, 2d Dist. Montgomery No. 27117, 2018-Ohio-197, ¶ 16, citing *State v. Johnson*, 2015-Ohio-5491, 55 N.E.3d 648, ¶ 95 (2d Dist.).

{¶ 86} According to C.H.'s grand jury testimony, which was read at Wilson's trial, C.H. and Wilson dated for a couple years when C.H. was 17 to 19 years old. In January 2017, C.H. was pregnant and had her own residence in Springfield; Wilson would visit her.

{¶ 87} At approximately 4:00 a.m. on Friday, January 27, Wilson came to C.H.'s

residence drunk and high, and he pushed her. Wilson claimed the house smelled like sex and said that C.H. had until the next day to tell him the truth. C.H. denied his accusation. The next day, when a couple of Wilson's friends were there, Wilson again accused her of cheating on him. After his friends left, Wilson hit and punched C.H.'s face, grabbed her by her hair, kicked her in the head, and while C.H. was on her knees, repeatedly kneed her in the face. C.H. testified that Wilson threatened her and her family, saying that there would always be a way that he could find her. Wilson told C.H. that, if C.H. were to leave, he would go after her family until she came out of hiding.

{¶ 88} At one point, Wilson told C.H. that she had a choice: she could fight back and lose her life, or she could have grease poured onto her. C.H. elected to "do the grease." C.H. screamed as Wilson poured grease on her back, and Wilson threatened to cut her throat with a fork if she did not stop; C.H. told the grand jury that she instantly became silent. C.H. told the police that she also was hit with a green metal fence post.

{¶ 89} On February 8, C.H. went into labor and went to the hospital; C.H. testified that Wilson believed her injuries were then healed enough that she could go to hospital and provide an explanation for her physical condition; Wilson threatened C.H. not to mention his name. C.H. gave birth on February 8, and had numerous visible injuries, including bruises, burn marks, and peeling skin. At the time of the grand jury hearing at which C.H. testified, C.H. stated that she still had a broken nose and a broken toe from the incident.

{¶ 90} C.H. testified to the grand jury that, for a couple of days at the hospital, she made up a story that she had been in a car crash, because Wilson was at the hospital with her. After Wilson was banned from the hospital, she reported the abuse.

{¶ 91} Dr. Meghan Arndts, a general surgeon, treated C.H. for her injuries after the birth of her baby. The doctor testified that C.H. initially reported that her injuries were the result of an automobile accident in Indiana. Dr. Arndts testified, however, that C.H.'s injuries were not consistent with that reported cause. Dr. Arndts further testified that on February 11, C.H. told her that she (C.H.) had been assaulted by the father of her child; C.H. told Dr. Arndts that the father of her child had kicked her with steel-toe boots, hit and punched her with his fists, and poured grease on her. C.H. told Dr. Arndts that the injuries to her back and arms were from hot grease, and the circular wounds on her shins were from being stepped on with stilettos. Dr. Arndts observed Wilson at the hospital with C.H. on a couple occasions.

{¶ 92} On February 11, Officer Cody McFall was dispatched to Springfield Regional Hospital on a reported assault involving C.H. McFall testified that C.H. told him that more than a week prior, she had gotten into an argument with Wilson, the father of her child. According to McFall, C.H. stated that Wilson accused her of cheating on him, and the argument escalated to the point where Wilson kicked and stomped on her and told her that she could either fight back and die or take grease. C.H. told McFall that Wilson had poured a cup of boiling grease on her while she was on the ground, striking her back and part of her arm. McFall took photographs of C.H.'s injuries. In one photo, McFall tried to capture a shoe tread that was visible in a bruise on her thigh. C.H. completed a probable cause form while at the hospital.

{¶ 93} Dr. Arndts and McFall denied that C.H. was threatened with the loss of her baby if she failed to accuse Wilson of the assault.

{¶ 94} Tori LeMaster with Clark County Family and Children Services testified that

she met with C.H. at the hospital due to C.H.'s testing positive for benzodiazepines in her urine and having injuries that did not match the reported cause. C.H. initially told LeMaster that her physical injuries were caused by a car accident in Reynoldsburg, Ohio. LeMaster indicated that the positive drug screen was enough to trigger her involvement.

{¶ 95} LeMaster testified that she asked C.H. who her support people were, and a safety plan was prepared for her child. LeMaster stated that she did not threaten to take C.H.'s child if C.H. did not say that she was a victim of domestic violence. At the crisis response team meeting held a few days later, C.H. told LeMaster that Wilson, the child's father, had suspected C.H. of cheating and that Wilson punched her in the face multiple times with his fist. C.H. further stated to LeMaster that Wilson kicked and stomped her while she was on the floor. C.H. told LeMaster that the incident occurred over three days, and on the last day, Wilson asked her if she wanted to fight for her life or take hot grease; C.H. told LeMaster that she did not want to die and told Wilson she would take the hot grease, which Wilson poured on her back.

{¶ 96} Detective Sandy Fent with the Springfield Police Department testified that she met with C.H. on February 14, 2017, and walked with C.H. through C.H.'s residence. Fent collected several items, including a green utility knife, a green metal fence post, a shirt that was covered in grease, and a pair of leggings. C.H. told Fent that most of the assault occurred in the living room, but the assault with grease occurred in the bathroom. Fent testified that the house had a strong odor of grease, and there was grease in the bathtub. Fent located drops of blood, which C.H. said were hers, on the stairs in the house. C.H. told Fent that the living room appeared to have been cleaned.

{¶ 97} Wilson presented six witnesses at trial: three police officers, a nurse, C.H.,

and his girlfriend, Ashley Balem. Officer Roger Jenkins testified that he was called to the hospital because a gentleman in the maternity ward (Wilson) was harassing hospital staff. Jenkins stated that C.H. did not want to talk to him.

{¶ 98} Officer Justin Massie testified that he was called to the hospital to speak with C.H.; C.H. had reported that she had been in a car crash, but medical staff had said that her injuries were inconsistent with a car accident. Wilson asked Massie if C.H. had road rash; Massie testified that his report mentioned road rash because hospital personnel reported that C.H. had used that phrase. Massie stated that C.H. told him that she had been in a car crash in Reynoldsburg, Ohio; Wilson and another woman initially were the room when Massie spoke with C.H.

{¶ 99} On cross-examination, Massie stated that he contacted the Reynoldsburg police to investigate the alleged car accident. Neither the Reynoldsburg police nor the police in neighboring jurisdictions had any report of a crash. Massie further testified that when C.H. was giving her statement (with Wilson absent), C.H. received several phone calls; Massie stated that he could tell that the calls were from the people who had been in the room with C.H. and that the calls were about what she was saying to the officer.

{¶ 100} Wilson's third witness was Vicki Dunaway, a nurse, who testified that C.H. had told another doctor that her injuries were the result of a car accident in Indiana. Dunaway stated that Wilson was not in the room at that time.

{¶ 101} Wilson recalled Detective Fent. Wilson asked her about whether a fork could be used to cut someone's throat and why the detective collected the box cutter from C.H.'s house. Wilson asked Detective Fent whether a woman could have committed the assault, based on Dr. Arndst's testimony about stilettos; Fent replied, "Not in my opinion."

Wilson also asked whether Fent believed a woman could survive a car accident and a beating; Fent responded that it would depend on the circumstances. Wilson asked why the police did not fingerprint the items it collected; Fent responded that C.H. had told her the items were used in the assault and she did not see a need to fingerprint them. Wilson questioned Fent about which version of events was consistent with C.H.'s testimony, about the photographs of C.H.'s house, and about what C.H. had said to the detective. Fent testified that C.H. told her (Fent) that Wilson had assaulted her (C.H.) in her home and that the assault was the story that was consistent with C.H.'s injuries. Fent stated that C.H. mentioned that someone else was present for part of the incident. Fent testified that C.H. had a cyst on her forehead that was unrelated to the assault.

{¶ 102} C.H. testified on Wilson's behalf. She testified that she went to the hospital alone to give birth. While there, she initially told hospital staff that she had been in a car accident; she testified that she lied to the grand jury when she said that she made up that story because Wilson was present at the hospital.

{¶ 103} C.H. testified that Wilson later came to the hospital with another woman, Ashley Balem, which "infuriated" her. C.H. stated that the police came to her hospital room and threated to arrest all three of them if C.H. did not say who had hurt her. C.H. told the officer that she was in a car crash. C.H. testified that Wilson jumped up and told the officer that he had not done anything and could not be arrested, at which point the officer told Wilson and Balem to leave the room. After Wilson and Balem left, the officer asked C.H. what really happened; C.H. testified that she again told the officer that she was in a car crash in Reynoldsburg, Ohio. C.H. testified that she lied when she said she was in a car accident.

{¶ 104} C.H. testified that she was constantly harassed by the police and medical staff to report an assault, and indicated that she was told that she would lose her child if she did not. She testified that they forced her to say that Wilson had caused her injuries. C.H. testified that Children Services also came and told her that it would charge her with neglect and take her baby if she did not accuse Wilson. C.H. denied taking benzodiazepine outside of the hospital.

{¶ 105} C.H. testified that she was "jumped by a bunch of females" whom she did not know. Wilson reviewed with C.H. the photos of her injuries. C.H. stated that she was cooking chicken in the kitchen and was weak from the beating; she stated that she lost her balance and fell, and the grease fell on her. C.H. testified that her home was neat, because the attack occurred outside her home. C.H. did not know what the black dots were on her stairs (that Detective Fent had identified as blood), and she said that the tub had grease from when C.H. bathed after the grease spilled on her.

{¶ 106} C.H. testified that she lied when she accused Wilson of spilling grease on her. She stated that she was angry that Wilson was cheating on her. C.H. indicated that Wilson was with Balem, not with her, when the assault occurred. C.H. testified that she visited Wilson in the jail, and he apologized for cheating on her. C.H. stated that she did not fear Wilson.

{¶ 107} C.H. testified that her child was taken on March 13, 2017, because she left the shelter where she had been staying. C.H. indicated that she left because there were drug addicts, she was robbed of all her money, and she felt her child was unsafe there. C.H. went to stay with Wilson's family. C.H. stated that she was told by the State that she could get her child back if she would let them place her in Urbana; C.H. said that she

did not want to go, and she did not get her child back.

{¶ 108} On cross-examination, C.H. testified that she was homeless but had stayed for several months with Wilson's family. When asked to describe the assault, C.H. stated that she was outside looking around, and a group of women "came out of nowhere." C.H. did not know how many people there were. C.H. stated that she waited to go to the doctor because she was scared to leave her house. The State played recordings of phone calls from the jail, in which Wilson apologized to C.H. and Wilson told C.H. to say that the players on the other basketball team jumped her.

{¶ 109} Finally, Ashley Balem testified that she had been dating Wilson for three years and that Wilson lived with her. Balem testified that she was not present when C.H. was attacked and did not know who attacked her. Balem stated that she was at home with family members and Wilson when the attacked occurred.

{¶ 110} Balem recalled going to the hospital with Wilson and hearing C.H. say that she (C.H.) was in a car crash. Balem testified that she heard an officer threaten to charge them all if C.H. did not say who attacked her. Balem recalled Wilson's protesting and being escorted out of C.H.'s room. Wilson and Balem tried to return the following day, but they were trespassed from the hospital.

{¶ 111} On cross-examination, Balem stated that she did not know the date or time that C.H. was attacked. Balem acknowledged that, during a phone call with Wilson while he was incarcerated, Wilson had told her that she had to be his alibi.

{¶ 112} In short, the evidence at trial indicated that C.H. provided multiple versions of the cause of her injuries. The State presented evidence that C.H. originally claimed to have been in an automobile collision, but her injuries were not consistent with a car

accident. C.H. later indicated to medical staff, law enforcement, and a grand jury that Wilson had assaulted her in her home over the course of several days, during which she was not allowed to leave. C.H. was pregnant with Wilson's child when the assault occurred, and her injuries were consistent with her description of the assault by Wilson. Detective Fent saw grease in C.H.'s bathtub, which also was consistent with C.H.'s statements that Wilson had poured grease on her back in the bathtub. Wilson made statements in jail phone calls that expressed remorse for C.H.'s injuries and suggested what C.H. should say about how the injuries occurred.

{¶ 113} In contrast, C.H. testified on Wilson's behalf that she was attacked by a group of women, not Wilson, and she expressly stated that Wilson did not commit the charges against him. C.H. identified an injury to her leg as being caused by a stiletto. C.H. testified that she was coerced to identify Wilson as her attacker.

{¶ 114} In reaching its verdict, the jury was free to believe all, part, or none of the testimony of each witness and to draw reasonable inferences from the evidence presented. *State v. Baker*, 2d Dist. Montgomery No. 25828, 2014-Ohio-3163, ¶ 28. It was the province of the jury, as the trier of fact, to weigh the evidence and determine whether the State had proven, beyond a reasonable doubt, that Wilson had committed felonious assault, abduction, and domestic violence, any combination of those, or none of those. *See State v. Ball*, 2d Dist. Clark No. 2017-CA-54, 2018-Ohio-605, ¶ 27. The jury was free to believe the State's version of events. Based on the totality of the evidence, we cannot conclude that the jury lost its way in finding Wilson guilty of the charged offenses.

{¶ 115} As part of his assignment of error, Wilson claims that the jury's verdicts

were influenced by several improper evidentiary rulings. He notes that, during C.H.'s testimony, he repeatedly tried to present recordings of jail phone calls, which the trial court denied. Wilson also argues that, once C.H. testified, her grand jury testimony should have been considered as impeachment, not substantive, evidence.

{¶ 116} The record reflects that Wilson wished to present recordings of prior statements by C.H. that either contradicted the testimony of other witnesses or that were consistent with C.H.'s trial testimony. We find no abuse of discretion in the trial court's evidentiary rulings. Wilson questioned C.H. at trial about what occurred at her residence in late January, what happened at the hospital, and events subsequent to her release from the hospital. Wilson did not argue that C.H.'s recorded prior consistent statements were being offered "to rebut an express or implied charge against [her] of recent fabrication or improper influence or motive," Evid.R. 801(D)(1)(b), and thus those recorded statements were inadmissible hearsay. To the extent that Wilson wanted to present prior inconsistent statements by C.H. to impeach her, Wilson did not show "surprise and affirmative damage" so as to allow him to impeach his own witness. *See* Evid.R. 607(A). Finally, we disagree with Wilson that the State's use of C.H.'s prior statements under Evid.R. 804(B)(6) as substantive evidence was converted to impeachment evidence once C.H. appeared and testified on Wilson's behalf.

{¶ 117} Wilson's sixth assignment of error is overruled.

### VI. Allied Offenses of Similar Import

{¶ 118} In his fourth assignment of error, Wilson claims that the trial court erred in failing to merge the felonious assault and domestic violence offenses as allied offenses of similar import.

{¶ 119} As an initial matter, Wilson did not ask the trial court to merge the domestic violence offense with the felonious assault offense.   Accordingly, Wilson has waived this allied-offense argument, except for plain error.   *See State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 3; *State v. Trigg*, 2d Dist. Montgomery No. 26757, 2016-Ohio-2752, ¶ 12 (allied offense argument is subject to plain error review).   Wilson's alleged error is not reversible error unless it affected the outcome of the proceeding and reversal is necessary to correct a manifest miscarriage of justice.   *Id.*   A trial court's failure to merge allied offenses of similar import is plain error.   *E.g., State v. Shoecraft*, 2d Dist. Montgomery No. 27860, 2018-Ohio-3920, ¶ 56.

{¶ 120} The allied offenses statute, R.C. 2941.25, provides:

(A) Where the same conduct by [a] defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 121} When considering whether multiple offenses are allied offenses of similar import, a court must ask three questions: " '(1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation?' "   *State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615,

49 N.E.3d 266, ¶ 12, quoting *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 31. An affirmative answer to any of those questions permits separate convictions. *State v. Caldwell*, 2d Dist. Montgomery No. 27856, 2018-Ohio-4639, ¶ 22, citing *Earley* at ¶ 12 and *Ruff* at ¶ 31.

{¶ 122} As to the import or significance question, offenses are of dissimilar import within the meaning of R.C. 2941.25(B) "if the harm that results from each offense is separate and identifiable." *Ruff* at ¶ 23. In regard to animus, " '[w]here an individual's immediate motive involves the commission of one offense, but in the course of committing that crime he must, [a] priori, commit another, then he may well possess but a single animus, and in that event may be convicted of only one crime.' " *State v. Ramey*, 2015-Ohio-5389, 55 N.E.3d 542, ¶ 70 (2d Dist.), quoting *State v. Logan*, 60 Ohio St.2d 126, 131, 397 N.E.2d 1345 (1979). In other words, "[i]f the defendant acted with the same purpose, intent, or motive in both instances, the animus is identical for both offenses." *State v. Hudson*, 2013-Ohio-2351, 993 N.E.2d 443, ¶ 54 (2d Dist.), quoting *State v. Lewis*, 12th Dist. Clinton No. CA2008-10-045, 2012-Ohio-885, ¶ 13.

{¶ 123} The failure to merge offenses of felonious assault and domestic violence may constitute plain error. *State v. Trigg*, 2d Dist. Montgomery No. 26757, 2016-Ohio-2752, ¶ 12.

{¶ 124} At sentencing, the prosecutor asserted that the offenses did not merge. She argued that "[t]he felonious assault, the pouring the grease on her back[,] was at a different time than the wounds that were inflicted about her body. As she [C.H.] testified to the grand jury, those happened while Ashley was there. That was over the course of three days. And the abduction, he held her there until the 8th." (Sentencing Tr. at 17.)

{¶ 125} The State improperly parsed the felonious assault and domestic violence offenses at sentencing. Count One of the indictment alleged that Wilson committed felonious assault "as a continuous course of conduct from on or about January 27, 2017 to on or about January 31, 2017." Count Three of the indictment similarly alleged that Wilson committed domestic violence "as a continuous course of conduct from on or about January 27, 2017 to on or about January 31, 2017." The bill of particulars, filed under Case No. 2017-CR-102, addressed the three charges in a single paragraph:

On or about January 27, 2017, the defendant, Steve Wilson, Jr., * * * did assault [C.H.] by punching her, kicking her, and stomping on her. He also poured hot grease onto [C.H.'s] back causing burns to her back. The victim had several bruises on her body, burn marks, broken toe, and nasal fracture. The victim was afraid of the defendant because he had told her that he would kill her if she left. [C.H.] was pregnant at the time of the incident with the Defendant's child.

{¶ 126} The State's closing argument addressed each of the charged offenses, but also did not distinguish between the felonious assault and domestic violence charges. The prosecutor stated:

* * * For felonious assault we have to prove that the Defendant did knowingly cause serious physical harm to another.

Ladies and gentlemen, that's obvious. Look at the injuries. Not only did she have a broken nose, broken toe. She's got burns on her back, burns on her arm. She is covered in bruises. She is covered in marks from head to toe. And that's a phrase we often hear, head to toe. She is

literally covered from head to toe. * * *

Domestic violence, that the Defendant did knowingly cause or attempt to cause physical harm to a family or household member and that the victim of the offense was a woman the Defendant knew was pregnant at the time of the offense. They share a child together. She told you that. He's at the hospital while she's having that baby or shortly thereafter, [t]elling her that the baby won't get taken from her. Physical harm in this case, abundantly clear.

(Trial Tr. p. 602-603.)

{¶ 127} In short, the State did not differentiate between the conduct underlying the felonious assault and the conduct underlying the domestic violence in the indictment, in the bill of particulars, or during the trial. Although the State reasonably could have based the felonious assault charge on Wilson's pouring grease on C.H. and based the domestic violence charge on Wilson's other assaultive conduct, the State did not do so.

{¶ 128} The trial court, having presided over Wilson's jury trial, was aware of the factual circumstances giving rise to Wilson's guilty verdicts. The conduct that formed the basis for the felonious assault charge also formed the basis for the domestic violence offense. The offenses were committed over the same period of time (January 27 to January 31) and with the same animus. Under the facts of this case, the trial court's failure to merge the felonious assault and domestic violence offenses constituted plain error.

{¶ 129} Wilson's fourth assignment of error is sustained.

**VII. Cost Bill**

{¶ 130} In his second assignment of error, Wilson claims that the clerk's cost bill did not comply with the Ohio Revised Code.

{¶ 131} "R.C. 2947.23(A)(1)(a) requires a trial court to impose the costs of prosecution against all convicted criminal defendants." *State v. Davis*, Ohio Slip Opinion No. 2020-Ohio-309, __ N.E.3d __, ¶ 13, citing *State v. White*, 103 Ohio St.3d 580, 2004-Ohio-5989, 817 N.E.2d 393, ¶ 14. The Ohio Supreme Court has defined "costs" to mean "the statutory fees to which officers, witnesses, jurors, and others are entitled for their services in an action or prosecution, and which the statutes authorize to be taxed and included in the judgment or sentence." *Middleburg Hts. v. Quinones*, 120 Ohio St.3d 534, 2008-Ohio-6811, 900 N.E.2d 1005, paragraph one of the syllabus. "The expenses which may be taxed as costs in a criminal case are those directly related to the court proceedings and are identified by a specific statutory authorization." *Id*. at ¶ 8; *State v. Snowden*, 2019-Ohio-3006, __ N.E.3d __, ¶ 92 (2d Dist.). If a jury is sworn, juror fees must be included in those costs. R.C. 2947.23(A)(2)(a).

{¶ 132} R.C. 2949.14 further provides: "Upon conviction of a nonindigent person for a felony, the clerk of the court of common pleas shall make and certify under the clerk's hand and seal of the court, a complete itemized bill of the costs made in such prosecution * * *." Citing R.C. 2949.14, the State claims that the clerk need not itemize court costs for an indigent defendant.

{¶ 133} Wilson relies on R.C. 2303.28, which states:

> In every case immediately on the rendition of judgment, the clerk of the court of common pleas shall make out and file with the papers in the cause, an itemized bill of his costs therein, including the judgment. He shall not issue

an execution in any cause for the costs of himself or of any other officer, or receive any costs for himself or any other officer, unless an itemized statement has been rendered.

He further cites to the Ohio Supreme Court's statements in *State ex rel. West v. McDonnell*, 139 Ohio St.3d 120, 2014-Ohio-1563, 9 N.E.3d 1030, ¶ 4, in which the court stated: "The clerk of the court of common pleas is required to prepare an itemized bill of costs upon the rendition of any judgment. R.C. 2303.28. The clerk cannot issue an execution for costs unless an itemized statement has been rendered. *Id.*; *see also* R.C. 2335.19(C)."

{¶ 134} We have commented that the calculation of the amount of court costs is a ministerial act. *State v. Lux*, 2d Dist. Miami No. 2010 CA 30, 2012-Ohio-112, ¶ 49. Thus, we have held that the trial court's failure to specify the amount of costs at sentencing does not affect the finality of the court's judgment entry and the itemized bill may be calculated later. *Id.*, citing *State v. Murillo*, 2d Dist. Montgomery No. 21919, 2008-Ohio-201, ¶ 14.

{¶ 135} The record before us does not contain the clerk's cost bill. The State has attached a cost bill to its appellate brief, but we cannot consider such an attachment. Without the cost bill before us, we cannot review the clerk's cost bill. *See State v. Tyus*, 8th Dist. Cuyahoga No. 108270, 2020-Ohio-103, ¶ 21.

{¶ 136} We note that, in his concurrence in *Davis*, Justice Donnelly recognized that "the burdens imposed by assessing court costs on indigent defendants are by no means inconsequential." *Davis* at ¶ 19 (Donnelly, J., concurring.) He further noted that "[a]n indigent defendant would have no way of knowing whether a cost has been imposed

inequitably. Thus, it is incumbent on defense counsel to ensure that any court costs that have been assessed against his or her client are accurate and equitable." *Id.* at ¶ 20. Nothing in this opinion precludes Wilson from raising his objections to the cost bill in the trial court.

{¶ 137} Wilson's second assignment of error is overruled.

## VIII. Conclusion

{¶ 138} The trial court's judgment will be affirmed in part, reversed in part, and remanded for resentencing on the merged domestic violence and felonious assault charges.

. . . . . . . . . . . .

TUCKER, P.J., concurs.

HALL, J., concurs in parts and dissents in part:

{¶ 139} I agree with the analyses and resolution of each of the assignments of error except for assignment of error four in regard to whether, on this record, the failure to merge the charges of felonious assault and domestic violence was plain error. In my opinion, the domestic violence involving multiple physical assaults of C.H. while downstairs and the distinct torture and felonious assault of C.H. in the upstairs bathtub by pouring hot grease on her back are dissimilar offenses, committed separately by different conduct, and with a separate and distinct animus. I therefore dissent from the conclusion that the felonious assault and domestic violence should have been merged for sentencing.

{¶ 140} Initially, I agree that the review of the merger issue is for plain error

because the defendant did not raise, did not present evidence, and did not argue that the felonious assault and domestic violence offenses should merge. But plain error should be recognized only "with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice." *State v. Zimpfer*, 2d Dist. Montgomery No. 26062, 2014-Ohio-4401, ¶ 29, quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 141} In addition, it is the defendant's burden to establish entitlement to merger pursuant to R.C. 2941.25. *State v. Sullivan*, 2d Dist. Montgomery No. 23948, 2012-Ohio-4317, ¶ 13. Therefore, if the defendant has not proven entitlement to merger of offenses, or if the evidence and circumstances regarding merger are in equipoise, the defendant's claim of merger fails.

{¶ 142} There is no manifest miscarriage of justice here. The majority focuses, improperly in my opinion, on the indictment, the bill of particulars, and the State's closing argument. That approach improperly dismisses the actual evidence presented at trial and diminishes the unchallenged comment of the prosecutor at sentencing that "[t]he felonious assault, the pouring the grease on her back[,] was at a different time than the wounds that were inflicted about her body." *See* ¶ 124, above. Although the criteria to decide what merges, and what does not, has changed in recent years, the information to be considered has not changed. "[W]hen deciding whether to merge multiple offenses at sentencing pursuant to R.C. 2941.25, a court must review the entire record, including arguments and information presented at the sentencing hearing, to determine whether the offenses were committed separately or with a separate animus." *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, ¶ 24. "Merger is a sentencing

question, not an additional burden of proof shouldered by the state at trial." *Id.* at ¶ 18.

{¶ 143} Review of the entire record reveals the charges in this case were initiated when C.H. went to the hospital for delivery of the defendant's baby. After several denials to nurses and doctors, she reluctantly admitted that her multiple injuries were caused by the defendant about 10 days before her admission. C.H. was interviewed on February 11, 2017 at the hospital by Officer McFall. She told the officer of the initial beating by the defendant. The police report, included in the record as attached to the PSI, states:

> *After the initial fight*, Mr. Wilson told [the victim] that she had to choose to "fight back and lose your life or take the grease." [She] said that Mr. Wilson told her he was going to throw hot grease on her as a final retribution. [She] stated she was scared and did not what to die so she told him she would take the grease. At that point, Mr. Wilson pour[ed] hot grease into a cup and threw it on [her] back. She had a large portion of her upper back covered in burnt and peeling skin and a smaller similar burn on her right forearm.

(Emphasis added.) (PSI, Law Enforcement Arrest Report.)

{¶ 144} The hot-grease incident and the serious nature of that injury were distinguished from the beating at the very beginning.

{¶ 145} Also on February 11, 2017, C.H. signed a terse "Statement of Probable Cause." That too distinguished the beating from the torture with grease. Quoted here, exactly as written in the victim's own handwriting, she stated that on the "last couple days of January" the defendant "punched, kicked me in the face. Throw hot grease on me." (State's Exhibit 51.) Thus, the beating and the torture with hot grease were also

distinguished from each other by the victim from the beginning.

{¶ 146} The separate and identifiable nature of the hot-grease event continued when C.H. testified before the grand jury on February 21, 2017. She said the defendant began hitting her at her apartment when his other girlfriend, Ashley Balem, was present. After Ashley left, "[i]t got worse." (State's Exhibit 44.) He kneed her in the face and kicked her in the head. At a point not entirely clear from just her testimony, "[h]e asked me, he was like, now, you have a choice, you can fight back and lose or lose your life or you can get hot grease poured on you. * * * He poured the hot grease on me and that was, I was screaming and he grabbed a fork and he told me, he was like, if you scream, you better quit screaming or being loud or I'm going to cut your throat. So, instantly I became silent." (*Id.* at p. 6.)

{¶ 147} On February 14, 2017, Detective Fent met C.H. at her apartment. The detective and C.H. went through the house.   It is apparent from the detective's testimony that most of the assault occurred in the living room. (Trial Tr. 213.) Downstairs was a living room and kitchen. The bathroom was upstairs. (Trial Tr. 218.) There was a greasy ring around the bath tub. (Trial Tr. 219.) Fent said, "That's where the grease was poured on her." (Trial Tr. 219-220.)

{¶ 148} C.H. had been admitted to the hospital on February 8 and discharged on February 13. Dr. Arndts, a board certified general surgeon, examined C.H. Initially C.H. told Dr. Arndts her injuries were from an automobile accident. However after several days, C.H. described the beating and the hot grease being poured on her. The prosecutor specifically asked Dr. Arndts about the medical dangers associated with such a large burn. (Trial Tr. 276.) The burn was also the only injury of the victim's many marks and

bruises about which the prosecutor inquired whether it hurt. Dr. Arndts replied that "[burns] are some of the most painful injur[ies] you can encounter." (Trial Tr. 277.)  In context, it is evident the prosecutor engaged in this line of questioning to demonstrate the burns were the "serious physical harm" required for a felonious assault charge, as opposed to physical harm that would support a domestic violence charge. There can be no question that the burns to the victim's back and arm, abundantly evident in the photographs (State's Exhibits 3, 7 and 8) taken about two weeks after the injuries, constituted serious physical harm.

{¶ 149} Tori LeMaster, an intake worker for Clark County Family and Children Services, met with C.H. at the hospital due to a positive drug test for benzodiazepines and injuries that did not match the initial story given. Eventually the victim told LeMaster that the child's father had beaten her over a three-day period. "*[O]n the last day* he asked her if she wanted to fight for her life or take hot grease." (Trial Tr. 338.) (Emphasis added.) LeMaster testified the victim stayed at a women's shelter for about a month and left March 12, 2017. It is evident from the record that at or before that time the victim no longer was cooperating with the State.

{¶ 150} It is no wonder that C.H. changed her story. By the jail phone recording from March 9, 2017, that was played for the jury, the defendant was already telling the victim how much he loved her, how sorry he was (although without exactly specifying for what), and that she could leave the women's shelter and seek help from "my peoples." He told her he was facing 19 to 20 years in prison and encouraged her not to cooperate. The record reveals this pressure continued up to and through the trial. Consequently, when the State submitted the bill of information a month later on April 13, 2017, upon

which the majority focuses, unable to obtain additional specificity from the uncooperative victim, it is no wonder that the bill was general and simply followed the indictment. The victim had become uncooperative. Even then, the bill of information did separately delineate the torture with grease. After describing the beating, the bill related that the defendant "*also* poured hot grease onto [the victim's] back causing burns to her back." (Emphasis added.)[5]

**{¶ 151}** It is also worth observing the court instructed the jury "[t]he evidence does not include the indictment or the opening statements or closing arguments of counsel and the Defendant." That is not only a common instruction, it is undeniably an accurate statement of law.[6] Likewise, a bill of particulars was not evidence. "A bill of particulars has a limited purpose—to elucidate or particularize the conduct of the accused alleged to constitute the charged offense. * * * A bill of particulars is not designed to provide the accused with specifications of evidence or to serve as a substitute for discovery." *State v. Sellards*, 17 Ohio St.3d 169, 171, 478 N.E.2d 781 (1985). As the Seventh District has concluded, whether the proof presented corresponds to the prosecutor's theory of the case set forth in opening or closing is a due process argument and not part of an allied

---

[5] Technically, the April 13, 2017 bill of information was not a response to the indictment on which Wilson was tried. The case was first indicted as Case No. 2017-CR-102, and a bill of particulars was requested in that case. The defendant was re-indicted in Case No. 2017-CR-227 with essentially identical charges except that a repeat-violent-offender specification was added as a result of Wilson's prior felonious assault conviction. Although on May 12, 2017 the court ordered all the filings in 2017-CR-102 to be transferred to 2017-CR-227, there was no separate request for a bill of information on the re-indictment. Likewise, there was no defense request for the bill of information to be more specific as to which of the injuries constituted "serious harm," required for felonious assault, and which injuries supported the domestic violence charge.

[6] Exceptions to the non-evidentiary nature of counsel's opening or closing are either a stipulation or judicial admission. Neither of those exceptions applied here.

offense analysis. *State v. Gilbert*, 7th Dist. Mahoning No. 08 MA 206, 2012-Ohio-1165, ¶ 36. "Whether or not the prosecutor's theory of the case as articulated in its opening and closing remarks corresponds to the actual evidence presented is not under review when examining the record for allied offenses." *Id.* For all of the foregoing reasons, I believe it is incorrect in an allied offense analysis to focus on the indictment, bill of information, or the theory and argument of counsel and ignore the actual evidence admitted at trial and the remainder of the record.

{¶ 152} The facts of this case are eerily similar to *State v. Brumley*, 11th Dist. Portage No. 2016-P-0071, 2017-Ohio-8803. There, the defendant dragged his fiancée into a bedroom and accused her of being romantically involved with another. He slapped and choked her. *Id.* at ¶ 2. After a brief respite, he slammed her against a wall and choked her again. The couple then went downstairs and started talking. He became agitated about the same allegation and punched her in the chest with a closed fist, breaking a rib. *Id.* at ¶ 3. He was found guilty of felonious assault, kidnapping and domestic violence, and was sentenced concurrently on all three. Brumley argued on appeal that the felonious assault and the domestic violence charges should have merged. The court of appeals disagreed. The court did not specify the time interval between the upstairs and downstairs assaults, only referring to the punch in the chest as "[l]ater that evening." *Id.* at ¶ 33. The court concluded that "[e]ach of these incidents were discrete and separate, causing separate identifiable harm, and accomplished with a separate animus. Thus, the crimes were not allied offenses of similar import." *Id.* at ¶ 34.

{¶ 153} In *State v. Dembie*, 9th Dist. Lorain No. 14CA010527, 2015-Ohio-2888, during an argument and struggle, in a matter of either "seconds or minutes," Dembie

stabbed his wife in the abdomen as she attempted to escape from him out of an upstairs bathroom window. She fell to the ground below. "Mr. Dembie proceeded down the steps and outside to where Mrs. Dembie lay. He stabbed her repeatedly and cut her throat, killing her." *Id.* at ¶ 9. An issue on appeal was whether guilty verdicts for felonious assault for the upstairs stabbing merged with the murder verdict for killing her. The appeals court concluded, "Although he resumed the attack a short time later, the fall created a distinct line of demarcation between the attack that occurred in the house and the one that occurred after Mrs. Dembie fell. Thus, we conclude that the record at trial establishes that Mr. Dembie committed the felonious assault while Mrs. Dembie attempted to flee out the bathroom window with an animus separate from the murder." *Id.* at ¶ 11.

{¶ 154} Parenthetically, the majority cites *State v. Trigg,* 2d Dist. Montgomery No. 26757, 2016-Ohio-2752, ¶ 123 for the proposition that the failure to merge domestic violence and felonious assault may constitute plain error. *Trigg* is not a representative case to cite for the proposition. In *Trigg,* the defendant punched the victim in the face several times with a closed fist. The victim's aunt told him to stop but he punched her several more times before leaving. The victim had 10 stiches to close cuts on her face, suffered an eye swollen shut, and had three chipped teeth. On appeal, the State *conceded* that in that case the failure to merge the domestic violence and felonious charges was plain error. Moreover, the record supports the notion that the assault by multiple punches was a singular event.   There really was no argument to the contrary.

{¶ 155} In my opinion, and in contrast, the domestic violence and the felonious assault here were dissimilar in import and significance. As brutal as the physical beating of the victim was, the horrific torture of the victim by subjecting her to a hot-grease

punishment was barbaric and beyond the pale. It is simply astonishing to conceive of one human being doing such a thing to another. The torture with hot grease was a different sort of violence from the beating, different in kind and different nature. The torture was both "dissimilar in import [and] significance." *Ruff* at ¶ 31. For that reason alone, these offenses in this case should not merge.

{¶ 156} But the offenses also were committed separately. There is undoubtedly some temporal distinction between the beating and the hot grease. The defendant had to take a break in the beating and ask if C.H. wanted to "take the grease." And because no rational person keeps hot grease readily available, he probably had to heat it up. He certainly had to go get a cup of the grease to pour on her. Furthermore, there is some evidence the hot grease event was on a different day from when the beating began, and the grease pouring was upstairs in the bathtub rather than in the downstairs living room. There was "a line of demarcation," *Dembie*, 9th Dist. Lorain No. 14 CA 010527, 2015-Ohio-2888, ¶ 11, between the beating and the burning with hot grease. Wilson has failed to demonstrate that these offenses were committed anything but separately and, for that reason too, the offenses do not merge.

{¶ 157} But perhaps the most apparent reason why the offenses do not merge is because they were committed with a different animus or motivation. I repeat, as brutal as the beating of the victim was, the horrific torture of the victim by subjecting her to a hot-grease punishment was barbaric. Domestic violence is about power and control.[7] It is often borne out of rage, anger, hatred, or lack of self-control. Some of those same desires

---

[7] From expert testimony allowed in *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 162.

should be considered about one who would intentionally pour hot grease on the back of the mother of his unborn child. But the motivation necessary to submit another to a hot-grease punishment is different in kind than just power and control. It is to impose, and take delight in, pain, torture, absolute domination and submission. The offender has to have in his mind a vicious and depraved motivation, separate and distinct from the also indefensible motives that result in other forms of domestic violence. For this reason, I believe the hot-grease event had a separate and distinct animus and motivation from the intense beating C.H. endured. Therefore, the offenses of domestic violence and felonious on this record do not merge for sentencing.

**{¶ 158}** I conclude that the appellant has failed in his burden to demonstrate merger of the described offenses and dissent from the majority's conclusion to the contrary. There is no error and certainly no plain error. Accordingly, I concur in part and dissent in part.

Copies sent to:

John M. Lintz
Brian Brennaman
Hon. Richard J. O'Neill